IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V. CRIMINAL NO. 3:25-CR-79-CWR-ASH

CORNELIUS ELLIS

**MOTION TO DISMISS THE INDICTMENT**

The defendant, CORNELIUS ELLIS, by and through the undersigned counsel, files this Motion to Dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12.

## I. Factual Background

On May 6, 2025, the grand jury returned an indictment charging Mr. Ellis with one count of possession of a firearm by a person who has previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of § 922(g)(1). ECF 3.

## II. Legal Standard

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the court to rule on a motion involving factual issues provided the court states its essential findings on the record). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *See Flores*, 404 F.3d at 325.

## III. Second Amendment

Section 922(g)(1) criminalizes firearm possession for any person who has been convicted of a crime punishable for a term exceeding one year. Under the framework announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), § 922(g)(1) violates the Second Amendment facially and as applied to Mr. Ellis.

### A. *Bruen* fundamentally changed the framework for analyzing Second Amendment challenges.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). In *Bruen*, the Court set out "the standard for applying the Second Amendment," creating a two-step process to consider the constitutionality of a statute implicating the right:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24.

The Government has the burden to justify a regulation implicating a Second Amendment right. *Id.* at 17. To meet that burden, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

The framework announced in *Bruen* "established a new historical paradigm for analyzing Second Amendment claims." *United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024), *cert. denied*, No. 24-6625, 2025 WL 1727419 (U.S. June 23, 2025). Any pre-*Bruen* precedent is "obsolete." *Id.* (citing *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir.), *cert. granted*, 143 S.

Ct. 2688, 216 L. Ed. 2d 1255 (2023), *and rev'd and remanded*, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024)).

**B. The Second Amendment's plain text covers Mr. Ellis's conduct.**

At the first step in *Bruen*, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen,* 597 U.S. at 17. Mr. Ellis easily meets that inquiry. First, the Second Amendment plainly covers his possession of a firearm. The term "'[k]eep arms' was simply a common way of referring to possessing arms." *Heller*, 554 U.S. at 583. And it is well-established that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *see United States v. Rahimi*, 602 U.S. 680, 691–92 (2024). Section 922(g)(1), which completely and permanently bans the possession of firearms, implicates conduct plainly covered by the Second Amendment's text.

Second, even with a felony conviction, Mr. Ellis is among "the people" that the Second Amendment protects. The Second Amendment covers all citizens by conferring the right "to keep and bear arms" on "the people." U.S. CONST. amend. II. Both *Heller* and *Bruen* begin their analysis with the presumption that "the people" means all people under the protective umbrella of the Constitution. *See Heller*, 554 U.S. at 579–81; *Bruen*, 597 U.S. at 20, 70. *Heller* holds that when the Constitution references the rights of "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Likewise, *Bruen* reiterated that the Second Amendment guarantees to "all Americans" the right to keep and bear arms. *Bruen*, 597 U.S. at 70 (citing *Heller*, 554 U.S. at 581).

And in *Rahimi*, the Supreme Court followed that principle. There, the Supreme Court applied *Bruen* in the context of a challenge to § 922(g)(8), which "prohibits an individual subject

to a domestic violence restraining order from possessing a firearm." *Rahimi*, 602 U.S. at 684. Despite a state court's determination that the defendant had committed "family violence," the Court proceeded directly to *Bruen*'s second step without pausing to consider whether the defendant was among the people protected by the Second Amendment. *Id.* at 687; *see also Diaz*, 116 F.4th at 466 ("The Court in *Rahimi* … assum[ed] that Rahimi was protected by the Second Amendment even though he had committed 'family violence.'").

The Fifth Circuit has firmly rejected the argument that the plain text of the Second Amendment excludes felons such as Mr. Ellis. The court invoked then-Judge Barrett's description of two different approaches to the Second Amendment: "one approach 'uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.'" *Diaz*, 116 F.4th at 466 (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). The court concluded that "*Bruen* mandates the second approach." *Id.* And it explained that while a defendant's "status as a felon is relevant[,] … it becomes so in *Bruen*'s second step of whether regulating firearm use in this way is 'consistent with the Nation's historical tradition' rather than in considering the Second Amendment's initial applicability." *Id.* (quoting *Bruen*, 597 U.S. at 24).

The Second Amendment right belongs to "all Americans." *Heller*, 554 U.S. at 580–81. The categorical ban on Mr. Ellis's possession of a firearm based on his prior conviction status is presumptively unconstitutional under the plain text of the Second Amendment.

### C. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Because the plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1), the Government bears the burden to demonstrate that the law is consistent with the Nation's historical tradition of firearm regulation. The Government cannot do so here.

Before explaining why not, it helps to review the Supreme Court's guidance about how to perform the analysis. In *Rahimi*, the Court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. To do that, a court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29).

This inquiry requires a court to train its focus on "why and how the regulation burdens the right" to keep and bear arms. *Id.*; *see Bruen*, 597 U.S. at 29. Both questions are important. A regulation may satisfy the "why" inquiry "if laws at the founding regulated firearm use to address particular problems." *Rahimi*, 602 U.S. at 692. But satisfying the "why" is not sufficient: "[e]ven when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id*. The challenged regulation need not be a "dead ringer" for a historical precursor, but it "must comport with the principles underlying the Second Amendment." *Id*.

In addition to focusing on "why" and "how," a court must pay attention to "when" a proffered historical analogue was in place. In *Bruen*, the Supreme Court engaged in a detailed analysis of statutes and regulations, giving priority to those in existence at the time the Second Amendment was ratified. *See* 597 U.S. at 30–34. The Court did so because "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. Historical evidence from the late nineteenth century and

the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66 n.28; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 272 (2022) (stating that "how the States regulated" when a constitutional Amendment was ratified is "the most important historical fact").

To prove that a challenged regulation is consistent with the Nation's historical tradition of firearm regulation, the Government faces a "heavy burden, as the Second Amendment 'is *not* a second-class right.'" *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) (quoting *Bruen*, 597 U.S. at 70).

**1. No application of § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.**

Section 922(g)(1) violates the Second Amendment on its face[1] under the *Bruen* framework. Mr. Ellis acknowledges that this argument is foreclosed by *Diaz*, 116 F.4th at 472, but he makes the argument here to preserve it for further review.

In *Diaz*, the court held § 922(g)(1) constitutional as applied to a defendant with a prior conviction for vehicle theft and, therefore, constitutional on its face. *Diaz*, 116 F.4th at 472. The court relied on three historical analogues: (1) historical laws authorizing capital punishment and estate forfeiture; (2) unadopted proposals to modify the Second Amendment; and (3) colonial-era "going armed" laws. *Id.* at 468–72. It held that "taken together," these analogues establish a "tradition of firearm regulation" that supports the constitutionality of § 922(g)(1) as applied to a defendant with a prior conviction for vehicle theft and on its face. *Id.* at 472.

The court's reliance on these analogues is misplaced. As for historical laws authorizing capital punishment and estate forfeiture, the court recognized disagreement with its premise,

[1] Though courts generally consider the constitutionality of a statute as applied before determining its facial constitutionality to avoid striking down the statute in its entirety, *see Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020), Mr. Ellis addresses his facial challenge to § 922(g)(1) first for purposes of analytical clarity.

noting that at least one other court had concluded that "just because 'Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Id.* at 470 (quoting *Range v. Attorney General*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *vacated in light of Rahimi*, 144 S. Ct. 2706, 219 L.Ed.2d 1313 (2024).

The disagreement does not end there. Then-Judge Barrett explained that capital punishment and estate forfeiture laws do not justify felon dispossession statutes in her dissent in *Kanter*, 919 F.3d at 458. She explained that while felonies were associated with death and civil death at English common law, "the American picture is far more complex." *Id.* (Barrett, J., dissenting). Indeed, "[d]uring the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Id.* at 459 (Barrett, J. dissenting).

And she emphasized that "as the number of designated felonies continued to grow, so did the variations on punishment, especially in the American colonies." *Id.* (Barrett, J. dissenting). So much so that "[t]hroughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'" *Id.* (Barrett, J., dissenting) (citing Lawrence M. Friedman, Crime and Punishment in American History 42 (1993)).

The history of civil death is similarly unavailing. As society shifted away from capital punishment, courts faced difficulty "applying the ancient concept of civil death." *Id.* at 460 (Barrett, J. dissenting). They "struggled to determine how—if at all—the old concept of civil death applied to felons serving sentences for a term of years." *Id.* at 461 (Barrett, J., dissenting). In early cases, courts "associated the *loss* of rights under a theory of civil death only with capital and life sentences." *Id.* (Barrett, J., dissenting). And in later cases courts "held that the rights of felons

serving less than life were merely *suspended* during the term of the sentence." *Id.* (Barrett, J., dissenting). In short, "the consequences of a felony conviction were not as categorically severe" as the *Diaz* court suggested. *See id.* (Barrett, J., dissenting).

In his 1803 edition of Blackstone's Commentaries, St. George Tucker noted the complete absence of civil death or estate forfeiture in the laws of Virginia and the United States Code. St. George Tucker, 5 BLACKSTONE'S COMMENTARIES 377 n.8 (1803). This led him to declare the practice "abolished in this country, so far as relates to the recompense to be made to the state, or the United States." *Id.* at 387 n.14. Writing in 1832, James Kent made a similar point. "[T]he tendency of public opinion," he explained, "has been to condemn forfeiture of property, at least in cases of felony, as being an unnecessary and hard punishment of the felon's posterity." 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 385 (2d ed 1832).

The unadopted proposals to modify the Second Amendment fare no better. The *Diaz* court admitted that "relying solely on these types of unadopted proposals to establish a tradition is a 'dubious' practice." *Diaz*, 116 F.4th at 470. Rightly so. Among other things, "none of the relevant limiting language made its way into the Second Amendment"; "proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion"; and "similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment." *Kanter*, 919 F.3d at 455 (Barret, J., dissenting) (citations omitted). And the proposals do not support categorically disarming felons: "[t]he concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury." *Id.* at 456 (Barrett, J., dissenting).

Finally, going armed laws do not provide a relevantly similar historical analogue for felon dispossession. In *Rahimi*, the Supreme Court used these laws, among others, to justify § 922(g)(8). *Rahimi*, 602 U.S. at 698–99. That provision, though, was a better fit. Going armed laws and § 922(g)(8) "restrict[ed] gun use to mitigate demonstrated threats of physical violence," satisfying the "why" inquiry. *Id.* at 698. And both schemes "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon," satisfying the "how" inquiry. *Id.* at 699. The Supreme Court also emphasized that the restriction in § 922(g)(8) was "temporary" because it "only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Id.*

None of these premises hold for § 922(g)(1). Section 922(g)(1)'s apparent purpose is more general: to restrict firearms from those who have broken the law without regard to whether their convictions involved violence. Its burden is more onerous: it permanently disarms all felons even though no court has determined that a defendant would threaten another with a weapon.

The poor fit between colonial-era regulation and § 922(g)(1) is unsurprising. As many scholars have concluded, "no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms." C. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1374–79 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 698 (2009) (observing that such prohibitions have their origins in the twentieth century). Then-Judge Barrett and other jurists have likewise concluded that "Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451, 453–64 (Barrett, J., dissenting) (surveying history); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("[S]tates did not start to enact [felony-based prohibitions on

possession] until the early 20th century."); *Folajtar v. Att'y Gen. of U.S.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("[T]he issue of disarming felons is open. Precedent does not settle its historical limits. Rather, we must analyze the history ourselves and ask: Were all felons, dangerous and nondangerous alike, equally excluded from the Second Amendment? No, they were not."); *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, J., concurring) ("[M]ore recent authorities have *not* found evidence of longstanding dispossession laws.").

And even the Government has agreed. In pre-*Bruen* briefing, the Government acknowledged that § 922(g)(1) "is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." U.S. Br. at *27–28, *United States v. Pettengill*, No. 10-2024, 2011 WL 1977759 (1st Cir. May 13, 2011) (quoting *United States v. Booker*, 644 F.3d 12, 23–24 (1st Cir. 2011)). The Government has stated numerous times: "As for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms." *E.g.*, U.S. Br. at *25, *United States v. Staten*, No. 10-5318, 2011 WL 1542053 (4th Cir. Apr. 25, 2011) (citing Marshall, *supra*, at 696–728).

The Government cannot show that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. The provision is unconstitutional on its face.

**2. The Government cannot show that § 922(g)(1)'s application to Mr. Ellis is consistent with the Nation's historical tradition of firearm regulation.**

Section 922(g)(1) violates the Second Amendment as applied to Mr. Ellis. "As-applied challenges are the basic building blocks of constitutional adjudication." *Gonzalez v. Carhart*, 550 U.S. 124, 168 (2007). "Unlike a facial challenge, an as-applied challenge does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Binderup v. Att'y Gen.*, 836 F.3d

336, 345 (3d Cir. 2016) (citation omitted); *see also generally Connelly*, 117 F.4th at 275–83 (conducting an as applied *Bruen* analysis of § 922(g)(3)).

Under *Diaz*, the Government must show that applying § 922(g)(1) to Mr. Ellis is "'consistent with the Nation's historical tradition' of disarming someone with a criminal history analogous to his." *United States v. Schnur*, 132 F.4th 863, 867 (5th Cir. 2025). Though the *Diaz* court concluded that § 922(g)(1) was constitutional as applied to a defendant with a conviction for vehicle theft, the court emphasized that its holding rested on "laws targeting the crime of theft, which was considered a felony at the time of the Founding" and which was punishable by capital punishment or civil death. *Diaz*, 116 F.4th at 468. As for other predicate convictions that were not recognized at the Founding or were not punishable by death or civil death, the court did not "foreclose future as-applied challenges." *Id*. at 470 n.4.

The court carefully limited its holding for at least two reasons. One, interpreting capital punishment and civil death statutes to justify disarming all felons would not "meet the level of historical rigor required by *Bruen* and its progeny." *Id.* at 469. This is because "not all felons today would have been considered felons at the Founding." *Id*.

Two, upholding the constitutionality of § 922(g)(1) as applied to all felons would risk unmooring the Second Amendment from its original understanding. Congress could "decide to change" the definition of felony "in the future." *Id*. And "[s]uch a shifting benchmark should not define the limits of the Second Amendment, without further consideration of how that right was understood when it was first recognized." *Id.*

Mr. Ellis's possession of a firearm is presumptively protected by the Constitution, and the Government cannot establish a historical tradition of completely and permanently stripping persons with felony convictions of their Second Amendment rights. It is the Government's burden

to show a historical tradition that supports disarming people like Mr. Ellis. Even if it could show that historical evidence supports disarming *some* felons and in *some* ways, the Government must show historical analogues supporting the disarmament of Mr. Ellis. *See generally Range*, 69 F.4th 96; *Connelly*, 117 F.4th at 275–83. Until the Government shows that the permanent restriction of Mr. Ellis's right to possess a firearm is consistent with the Nation's historical traditions, § 922(g)(1) violates the Second Amendment as applied to him. *See Bruen*, 597 U.S. at 17.

## IV. Fifth Amendment

### A. Equal Protection

The Fifth Amendment to the United States Constitution establishes that "equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights" and that "in the administration of criminal justice, no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses." *Yick Wo v. Hopkins*, 118 U.S. 356, 367–68 (1886) (internal quotations omitted). Federal laws are subject to strict scrutiny and may violate equal protection rights if they unevenly burden a fundamental right or target a suspect class. *See, e.g., Heller*, 509 U.S. at 319.

Section 922(g)(1) burdens Mr. Ellis's fundamental right to keep and bear arms. Though the Fifth Circuit has previously declined to find that § 922(g)(1) burdens a fundamental right based on precedent that assumed a historical tradition of disarming felons, *see, e.g., United States v. Darrington*, 351 F.3d 632, 634–35 (5th Cir. 2003); *see also Heller*, 554 U.S. at 626, *Bruen* has since rendered this case law obsolete. *See Diaz*, 116 F.4th at 465. As discussed more fully above, Mr. Ellis has a fundamental right to keep and bear arms and this Court should apply strict scrutiny to § 922(g)(1). Because the statute contains no uniform definition of the conduct that will result in the loss of the right to possess a firearm and instead relies on diverse state definitions, § 922(g)(1)

cannot withstand strict scrutiny. *See* 18 U.S.C. § 921(a)(20) ("What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held."). Moreover, § 922(g)(1) does not consistently restore the right to keep and bear arms and instead relies upon disparate state restoration schemes, resulting in a lack of uniform application. *See id.*

In *United States v. Goody*, 143 F.4th 617 (5th Cir. 2025), the Fifth Circuit held that a defendant may not "repackage his Second Amendment argument as a Due Process argument." *Goody*, 143 F.4th at 619. That holding was wrong for two reasons. First, *Goody* relies on inapposite dicta. As support for its holding, *Goody* cites a footnote in *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), *as revised* (June 29, 2011). *See Goody*, 143 F.4th at 619. That footnote addressed substantive due process, not equal protection. In *Portillo-Munoz*, the defendant had raised both substantive due process and equal protection claims. *See* Appellant's Initial Brief at *33–37, *United States v. Portillo-Munoz*, No. 11-10086, 2011 WL 2115675 (5th Cir. Feb. 7, 2011). The footnote rejected the defendant's "due process claim," but it did not mention his equal protection claim. *See Portillo-Munoz*, 643 F.3d at 442 n.4. And the footnote cited *Graham v. Connor*, 490 U.S. 386, 388 (1989), which held that pre-conviction excessive force claims are properly analyzed under the Fourth Amendment rather than substantive due process. *Graham* did not analyze equal protection. *See id.*

Second, *Goody* conflicts with Supreme Court precedent. Contrary to the language in *Goody*, the Supreme Court has applied equal protection to laws that infringe enumerated rights. *See, e.g., Williams v. Rhodes*, 393 U.S. 23 (1968) (applying strict scrutiny to a law that infringed the freedom of association and holding that the law violated equal protection).

## B. Due Process

Section 922(g)(1) violates Mr. Ellis's right to due process. *See* U.S. Const. amend. V. Justice Thomas noted in his dissent in *Rahimi* that "§ 922(g)(8) strips an individual of his ability to possess firearms and ammunition without any due process." *Rahimi*, 602 U.S. at 748 (Thomas, J., dissenting).[2] This was because "the ban is an automatic, uncontestable consequence of certain orders." *Id.* (Thomas, J., dissenting). Section 922(g)(8) affords "no hearing or opportunity to be heard on the statute's applicability, and a court need not decide whether a person should be disarmed." *Id.* (Thomas, J., dissenting). "The only process § 922(g)(8) requires is that provided (or not) for the underlying restraining order." *Id.* (Thomas, J., dissenting).

Section 922(g)(1) suffers these same defects. On its face, § 922(g)(1) is an automatic consequence of a felony conviction. It requires no finding that an individual should be disarmed or that an individual presents a danger to the public, if armed, before allowing for complete and permanent disarmament. All that is required is a conviction "in any court of[] a crime punishable by imprisonment for a term exceeding one year." § 922(g)(1). For the same reasons espoused in Justice Thomas's dissent, § 922(g)(1) offends Mr. Ellis's right to due process. *See Rahimi*, 602 U.S. at 748.

## V. Overbroad and Void for Vagueness

Section 922(g)(1) is facially unconstitutional because it sweeps too broadly and fails to provide a person of ordinary intelligence fair warning of what predicate felonies justify disarmament. It is both overbroad[3] and vague.

---

[2] The majority opinion declined to "address any due process concern" because Mr. Rahimi's "challenge was not litigated as a due process challenge and there is no such claim before us." *Rahimi*, 602 U.S. at 701 n.2.

[3] Although overbreadth challenges are most often raised in the First Amendment context, the Supreme Court concluded that a First Amendment overbreadth case provided the appropriate analysis for a right-to-travel challenge. *See Aptheker v. Sec'y of State*, 378 U.S. 500 (1964). *Rahimi* also suggests that due process challenges are available in the Second Amendment context. 602 U.S. at 701 n.2.

**A. Section 922(g)(1) is unconstitutionally overbroad.**

Section 922(g)(1) too broadly and indiscriminately restricts the Second Amendment's right to bear arms. Under the overbreadth doctrine, "[a] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). Regardless of whether the governmental purpose is "legitimate," "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Aptheker*, 378 U.S. at 508 (internal quotations and citation omitted).

The Second Amendment does not permit permanent disarmament based merely on a prior conviction for a crime that is today defined as a "felony." In *Diaz*, the court recognized that while § 922(g)(1) was constitutional as applied to Diaz's prior felony convictions, not all felonies allow for lifetime disarmament consistent with the Second Amendment:

> We emphasize that our holding is not only premised on the fact that Diaz is a felon. Simply classifying a crime as a felony does not meet the level of historical rigor required by Bruen and its progeny. The legislature has determined that the term "felony" encompasses all crimes punishable by more than one year of imprisonment, rendering Diaz a felon today. But not all felons today would have been considered felons at the Founding.

*Id*. at 469; *see id*. at 470 n.4 (acknowledging that other predicate convictions may not justify disarmament under § 922(g)(1)). Thus, not all persons previously convicted of "a crime punishable by imprisonment for a term exceeding one year," § 922(g)(1), can be disarmed consistent with the Second Amendment, *see Diaz*, 116 F.4th at 467. Yet, on its face, § 922(g)(1) broadly prohibits all individuals with prior felony convictions from keeping and bearing arms, "sweep[ing] too widely and too indiscriminately across the liberty guaranteed in the [Second] Amendment." *See Aptheker*, 378 U.S. at 514. "The clarity and preciseness of the provision in question make it impossible to

narrow its indiscriminately cast and overly broad scope without substantial rewriting." *Id.* at 515. Here, as the *Aptheker* Court determined,

> . . . an attempt to 'construe' the statute and to probe its recesses for some core of constitutionality would inject an element of vagueness into the statute's scope and application; the plain words would thus become uncertain in meaning only if courts proceeded on a case-by-case basis to separate out constitutional from unconstitutional areas of coverage. This course would not be proper, or desirable, in dealing with a section which so severely curtails personal liberty.

*Id.* at 516.

Section 922(g)(1) sweeps too broadly and indiscriminately by violating the liberties of individuals with prior felony convictions lacking in a sufficient historical tradition allowing for their constitutional disarmament. Although a facial challenge generally requires a litigant to "establish that no set of circumstances exists under which the [statute] would be valid," *Salerno*, 481 U.S. at 745, "the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied," *United States v. Hansen*, 599 U.S. 762, 769 (2023). Section 922(g)(1) is overbroad and thus facially unconstitutional.

**B. Section 922(g)(1) is unconstitutionally vague.**

The Fifth Amendment provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. "[T]he Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The Constitution requires that federal criminal laws "give ordinary people fair warning about what the law demands of them"; thus, "[i]n our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 448 (2019). Accordingly, due process guarantees that a "person of ordinary

intelligence [must have] a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104 (1972).

While not specifically discussing vagueness, the Supreme Court addressed the knowledge requirement governing a § 922(g)(1) conviction in *Rehaif v. United States*, 588 U.S. 225 (2019). There, the Court held that § 922(g)(1) requires the Government to prove that a defendant "knew he belonged to the relevant category of persons barred from possessing a firearm." *Id*. at 227, 237 (quote at 237). It explained that this "helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts," as "the possession of a gun can be entirely innocent." *Id*. at 232. "It is therefore the defendant's status, and not his conduct alone, that makes the difference. Without knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful." *Id*.

Section 922(g)(1) fails to provide specific notice of whether a person with a prior felony conviction can be constitutionally disarmed. The Fifth Circuit has explained that the statute allows for disarmament consistent with the Second Amendment only if the Government "demonstrate[s] that the Nation has a longstanding tradition of disarming someone with [an analogous] criminal history." *Diaz*, 116 F.4th at 467. Lower courts struggle with this analysis. *See Rahimi*, 602 U.S. at 742–43 & n.1 (Jackson, J., concurring) (explaining that "lower courts appear to be diverging in both approach and outcome as they struggle to conduct the inquiry *Bruen* requires of them"). By extension, there is no way for an ordinary person to know in advance of a court's retroactive declaration whether possessing a firearm post-conviction is a constitutional entitlement or a federal felony. There is nowhere that an ordinary person with a past criminal conviction can look for a "sure way to know what consequences will attach to their conduct," and to determine whether possessing a firearm is constitutionally permitted or will expose them to federal prosecution.

*Davis*, 588 U.S. at 448. *Bruen*, *Rahimi*, and *Diaz* make clear that it is not enough to look to the statute for guidance, and caselaw is likewise unhelpful as *Diaz* requires courts to engage in historical analysis for each predicate felony to ensure that there is a sufficient longstanding tradition of disarmament.

"When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *Davis*, 588 U.S. at 448. Section § 922(g)(1) is facially unconstitutional because it fails to provide an ordinary person with fair notice of what conduct is prohibited. Accordingly, this Court should dismiss the indictment and "invite Congress to try again." *Id*.

## VI. Commerce Clause

Mr. Ellis further asks this Court to dismiss the indictment because § 922(g)(1) unconstitutionally extends Congress's authority under the Commerce Clause. Mr. Ellis acknowledges that the Fifth Circuit has rejected this Commerce Clause argument, *see United States v. Rawls*, 85 F.3d 240, 243 (5th Cir. 1996), but he makes this constitutional argument to preserve the record for further review.

The test for determining the scope of Congressional power to regulate activities affecting interstate commerce is set forth in *United States v. Lopez*, 514 U.S. 549 (1995). In *Lopez*, the Supreme Court found that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id*. at 559. The *Lopez* decision appeared to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, 431 U.S. 563 (1977), which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." *Id*. at 575.

Members of the Supreme Court and lower courts have noted that *Lopez* and *Scarborough* are irreconcilable. *See Alderman v. United States*, 131 S. Ct. 700, 702 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez*."); *United States v. Seekins*, 52 F.4th 988, 991–92 (5th Cir. 2022) (Ho, J., dissenting) (citing cases); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting) ("[T]he precise holding in Scarborough is in fundamental and irreconcilable conflict with the rationale of [*Lopez*]."). But the Supreme Court has not addressed the precise impact of *Lopez* on *Scarborough*. *See United States v. Hill*, 927 F.3d 188, 215 n.10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between Scarborough and the Supreme Court's decision in Lopez, the Supreme Court has not granted certiorari on a case that would provide further guidance"). Lacking clear guidance, lower courts after Scarborough have continued to hold that § 922(g)(1)'s nexus element can be satisfied if the firearm traveled—at any point—across a state boundary. *See, e.g., Rawls*, 85 F.3d at 243.

This minimal nexus requirement in *Scarborough* does not satisfy *Lopez*. Mere gun possession—the crime for which Mr. Ellis is charged—involves entirely local, non-commercial activity. It does not involve participation in any cognizable market. *See Rawls*, 85 F.3d at 243 (Garwood, J., concurring) ("[O]ne might well wonder how it could rationally be concluded that mere possession of a firearm in any meaningful way concerns interstate commerce simply because the firearm had, perhaps decades previously before the charged possessor was even born, fortuitously traveled in interstate commerce."). *Scarborough*'s reading of the § 922(g)(1) nexus element is thus too broad, and it impermissibly extends federal power over purely local activity.

In *United States v. Seekins*, 52 F.4th 988, 989 (5th Cir. 2022) (Ho, J., dissenting) (citation omitted), Judge Ho, dissenting from the court's denial of rehearing en banc, warned of the overreach of the Commerce Clause as it relates to § 922(g), lamenting that:

> For too long, our circuit precedent has allowed the federal government to assume all but plenary power over our nation. In particular, our circuit precedent licenses the federal government to regulate the mere possession of virtually every physical item in our nation—even if it's undisputed that the possession of the item will have zero impact on any other state in the union. The federal government just has to demonstrate that the item once traveled across state lines at some point in its lifetime, no matter how distant or remote in time.
>
> That is no limit at all. If the only thing limiting federal power is our ability to document (or merely speculate about) the provenance of a particular item, the Founders' assurance of a limited national government is nothing more than a parchment promise.

Much like the circumstances Judge Ho complained of in *Seekins*, in this case, there is no record evidence that Mr. Ellis's possession of a firearm will have any impact on any other state and there is no record evidence that the firearm traveled across state lines at any particular moment in time. *Id*. at 990. Current precedent fails to recognize that "[t]here must be some limit on federal power under the Commerce Clause" and, in the context of § 922(g), it "allows the federal government to regulate any item so long as it was manufactured out-of-state—without any regard to when, why, or by whom the item was transported across state lines." *Id*. (emphasis in original). This allows the federal government to regulate "virtually every tangible item anywhere in the United States"; "it's hard to imagine any physical item that has not traveled across state lines at some point in its existence, either in whole or in part." *Id*.

The Commerce Clause power "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012); *see also Alderman*, 131 S. Ct. at 703 (Thomas, J., dissenting) ("[P]ermit[ting] Congress to regulate or ban possession of any item that has ever been offered for sale or crossed state lines" would be "[s]uch

an expansion of federal authority" as to "trespass on traditional state police powers."). To find that § 922(g)(1) does not constitute Congressional overreach under the Commerce Clause supports a view that it is enough to confer federal jurisdiction "that some object (or component of an object) at some unknown (and perhaps unknowable) point in time traveled across state lines"; it is therefore "hard to imagine anything that would remain outside the federal government's commerce power." *Seekins*, 52 F.4th at 990 (Ho, J., dissenting). "There is no plausible reading of the Commerce Clause, as originally understood by our Founders, that could possibly give the federal government such reach." *Id.* (citations omitted). Accordingly, this Court should dismiss the indictment because § 922(g)(1) unconstitutionally extends Congress's authority under the Commerce Clause. While Mr. Ellis acknowledges that the Fifth Circuit has previously rejected this Commerce Clause argument, he makes this constitutional argument to preserve the record for further review.

Respectfully submitted, this 2nd day of October, 2025.

Respectfully submitted,

By: Omodare B. Jupiter
Federal Public Defender

*Michael L. Scott*
Michael L. Scott, MB#101320
Senior Litigator
Office of the Federal Public Defender
S. District of Mississippi
200 South Lamar St., Suite 200-N
Jackson, MS 39201
Telephone: 601-948-4284
Facsimile: 601-948-5510
Email: mike_scott@fd.org

Attorney for Defendant

## CERTIFICATE OF SERVICE

I, Michael L. Scott, hereby certify that on this day I electronically filed the foregoing Motion to Dismiss the Indictment with the Clerk of the Court using ECF system which sent notification of such filing to all attorneys of record.

This the 2nd day of October, 2025.

*/s/Michael L. Scott*
Attorney for Defendant